UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| WILLIAM CODY,<br><br>               Plaintiff,<br><br>    vs.<br><br>ASHLEY MCDONALD, INDIVIDUAL AND OFFICIAL CAPACITY; TIM MEIROSE, INDIVIDUAL AND OFFICIAL CAPACITY; DARIN YOUNG, INDIVIDUAL AND OFFICIAL CAPACITY; HEATHER BOWERS, INDIVIDUAL AND OFFICIAL CAPACITY; JESSICA STEVENS, INDIVIDUAL AND OFFICIAL CAPACITY; KAYLA TINKER, INDIVIDUAL AND OFFICIAL CAPACITY; DR. MARY CARPENTER, MD, INDIVIDUAL AND OFFICIAL CAPACITY; LINDA MILLER-HUNOFF, INDIVIDUAL AND OFFICIAL CAPACITY; STEVE BAKER, INDIVIDUAL AND OFFICIAL CAPACITY; AND JENNIFER WAGNER, INDIVIDUAL AND OFFICIAL CAPACITY;<br><br>               Defendants. | 4:14-CV-04155-RAL<br><br><br><br>REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT<br><br>DOCKET NOS. 26 & 41 |

**INTRODUCTION**

This matter is before the court on plaintiff William Cody's verified *pro se* complaint pursuant to 42 U.S.C. § 1983. This matter has been referred to this magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and the October 16, 2014 standing order of the Honorable Karen E. Schreier, district court judge. Both Mr. Cody and the defendants have filed their own cross motions

for summary judgment.  See Docket Nos. 26 & 41.  The following is this court's

recommended disposition of those two motions.

## FACTS

### A.    Statement of Undisputed Material Facts

The court recites Mr. Cody's and defendants' statement of facts and

notes overruled objections in the footnotes.[1]  Objections that were sustained are

reflected in the substance of the text of this opinion.

Mr. Cody is an inmate at the SDSP.[2]  Mr. Cody initiated this lawsuit on

October 14, 2014, by filing a verified complaint.[3]  In that document Mr. Cody

---

[1] A great number of Mr. Cody's objections to defendants' statements are that a
particular statement of fact is not supported by a citation to the record.  For
example, defendants make the following statement:

> 51.    As provided for in SDDOC Policy 1.1.E.3, Offender
> Access to DOC Records, "outside medical records remain the
> property of outside providers."  McDonald Affidavit ¶ 28; Exhibit 1.
> Pursuant to said policy, "Any request for medical records generated
> by an outside provider must be directed to the outside provider."

See ¶ 51 of Docket No. 43, Defendants' Statement of Undisputed Material
Facts.  Mr. Cody admits the first sentence in defendants' ¶ 51 is true, but
denies the second sentence because it is not followed by a citation to the
record.  See ¶ 51 of Docket No. 52.  A cursory examination of the DOC policy in
question, found at Docket No. 42-1, pp. 4-5, establishes that defendants'
quotation found in the second sentence of their ¶ 51 comes directly from DOC
policy 1.1.E.3.  Where the record support for defendants' statement is clear, as
in this example, the court overrules Mr. Cody's objections.  The point of
objections to material statements of fact is to narrow the issues to only those
issues that are really in dispute.  By constantly objecting to statements which
are unobjectionable, Mr. Cody's method makes a mockery of this process.

alleged the defendants failed to provide him with the legal assistance he needed in order to prepare a complaint regarding medical treatment and medications. Because of defendants' failure, Mr. Cody was forced to prepare a complaint *pro se*. Mr. Cody also asserts defendants took his mail with no notice to him or the sender of the mail.

### 1.    Denial of Access to Medical Records

In the process of attempting to prepare his complaint, Mr. Cody alleges defendants denied him access to medical records from his outside medical care providers. DOC policy 1.1.E.3 provides that "[o]utside medical records remain the property of the outside provider. Any requests for medical records generated by an outside provider must be directed to the outside provider." See Docket No. 42-1 at pp. 4-5, subsection E. Under DOC policy, inmates are

---

[2] Mr. Cody objects to this statement as irrelevant. The fact that Mr. Cody is a prisoner in a state prison is, of course, key to his claims under § 1983. Furthermore, he himself avers that this is true in his verified complaint. See Docket No. 1. This portion of Mr. Cody's objection is overruled. The court agrees, however, that the crime for which he is incarcerated and the circumstances of the commission of the crime are irrelevant. That portion of the objection is sustained. A movant under Rule 56 is supposed to state those facts that are "material" to claims or defenses at issue. See FED. R. CIV. P. 56(a); DSD LR 56.1A. A material fact "is one that has the capacity to influence a decision." Cottage Sav. Ass'n. v. C.I.R., 499 U.S. 554, 570 (1991); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The reason Mr. Cody is in prison has no bearing whatsoever on whether his claims are meritorious.

[3] Mr. Cody objects, noting that his complaint is signed October 10, 2014, not the 14th. This spurious objection is overruled. A lawsuit is not "initiated" upon the *signing* of the complaint but rather upon the *filing* of that signed complaint with the court. See FED. R. CIV. P. 3. That act happened on the 14th, as defendants correctly assert.

3

not entitled to review that portion of their prison medical files containing reports from outside medical providers.

Mr. Cody avers he requested medical reports to be mailed to him personally from his outside ophthalmologist, Dr. Michael Griess. Dr. Griess mailed a report dated March 28, 2014, to Mr. Cody on three separate occasions. When that report arrived at the prison, defendants placed the report in Mr. Cody's prison medical file. Defendants did not provide notice to Mr. Cody or Dr. Griess that the reports were being handled in this fashion. Defendants claim this was inadvertent and that the reports were placed in the medical file because they did not know Mr. Cody had requested the reports. Mr. Cody asserts defendants acted as they did in order to deprive him of access to necessary medical information that would allow him to formulate his complaint.

Eventually, Mr. Cody complained to defendants. Defendants explained to Mr. Cody that they withheld his outside reports from him because those reports might contain dates of future medical appointments and knowledge of these appointments might pose a security risk. However, defendants told Mr. Cody that, in future, if he was requesting records from outside medical providers to simply tell defendants he was doing so and Mr. Cody would be allowed to view those records. Mr. Cody was allowed to view the March 28, 2014 report from Dr. Griess on June 9, 2014.

4

Mr. Cody alleges that, after this discussion with defendants regarding Dr. Griess' March 28 report, he requested six separate reports from outside medical providers:  reports from Dr. Griess dated October 24, 2014; November 17, 2014; November 19, 2014; November 26, 2014; and December 16, 2014; and Dr. Jeff Stevens (Dr. Griess' replacement) dated January 23, 2015.  See Docket No. 23 at p. 19.  Mr. Cody alleges he followed the procedure defendants suggested with regard to each of these six medical reports.  Id.  Nevertheless, Mr. Cody alleges defendants denied him access to each of these reports.  Id. Mr. Cody alleges these reports contain facts necessary for him to prepare his complaint about his medical care.  Id.

Defendants allege Mr. Cody did not follow the agreed-upon procedure for obtaining these six reports.  See Docket No. 42-34 at ¶¶ 17-18.  Moreover, defendants allege that they provided Mr. Cody with access to the December 14 and 17 reports on January 2, 2015 after Mr. Cody submitted a kite requesting to see the records on December 29, 2014.  Id.  Defendants allege they have no record of Mr. Cody ever having submitted a request for any of the other four enumerated reports.  Id.

In addition to reports from outside medical providers, Mr. Cody alleges he was not allowed to see the Utilization Management ("UM") forms in his prison medical file.  When a prison health care worker makes a request for a medical device, or medical services provided by an outside medical provider, the health care worker must submit a UM to Mary Carpenter, M.D., Regional

5

Medical Director for DOH Correctional Health Services.  Dr. Carpenter then either approves or disapproves of the request.  The UM often contains a brief notation by Dr. Carpenter as to why a particular UM is being denied.

Defendants rely on P-H-02A, a DOH Correctional Health Services written policy regarding release of information from inmate medical records.  See Docket No. 42-2.  That policy provides that, when an inmate requests to review their medical chart, the following documents should be removed from the chart so that the inmate may not see them:  UMs, any mental health records, and outside records.  Id. at p. 3.  Defendants assert that denying inmates access to UMs is supported by a valid penalogical goal.

### 2.   Denial of Mail

Finally, both parties agree that DOC policy requires defendants to notify an inmate if an inmate's mail is confiscated or destroyed.  Mr. Cody asserts defendants violated this policy by confiscating his outside medical providers' records which were mailed to him without giving notice to him or his doctors that the mail was confiscated.  Defendants argue Mr. Cody's mail from his doctors was not confiscated or destroyed, but merely placed in Mr. Cody's medical file.  Furthermore, defendants allege each medical record Mr. Cody requested to see from an outside provider was eventually given to him.

### 3.   Denial of Access to the Courts

Mr. Cody alleges in his complaint that the SDSP law library was inadequate as it lacked any legal references concerning the Americans with

Disabilities Act (ADA) which Mr. Cody wished to consult regarding his medical claims.  Mr. Cody did not submit any grievances regarding this specific issue to prison authorities.  He did on several occasions between 1996 and 2008 submit grievances alleging defendants were failing to provide him with an adequate law library, and several times he complained in 2013-14 that he was not receiving access to a legal professional's advice.  See Docket No. 55, at p. 94, ¶356.[4]

The Administrative Remedy Policy implemented by the South Dakota Department of Corrections (DOC) requires an inmate to follow a two-step process if he wishes to initiate a complaint concerning the application of any administrative directive, policy, unit rule or procedure or if he wishes to complain about any oversight or error affecting him.  See Docket No. 42-6, DOC Policy 1.3.E.2.  The first step is for the inmate to submit an Informal Resolution Request (IRR).  If the issue is not resolved within 10 days of filing the IRR, the inmate must file a Request for Administrative Remedy (AR).  An inmate must initiate his administrative complaint within 30 days of the date of

---

[4] Mr. Cody alleges he submitted grievances regarding the inadequacy of the contents of the law library on August 12, 1996 (denied September 3, 1996); on October 25, 2001 (denied November 4, 2001, because no other inmates complained); April 11, 2004 (denied); March 25, 2005 (denied); January 8, 2008 (denied); and July 8, 2008 (denied because complaint was inadequate).  See Docket No. 55 at p. 94, ¶ 356.  On several occasions in 2013 and 2014, Mr. Cody submitted grievances complaining that the contract attorney assigned to help him in lieu of an adequate law library was not helping him.  Id.; Docket No. 54 at ¶¶ 2, 5, 22, 28, 31, 36.

7

the incident.  Mr. Cody was familiar with this procedure and had correctly followed it numerous times.

The SDSP provides inmates with a law library, the contents of which are not addressed by defendants.  The SDSP also provides inmates with "access to persons trained in the law."  The DOC seeks to provide inmates with legal assistance through either or both avenues.

To this end, the DOC has contracted with a Sioux Falls attorney to provide legal assistance to inmates at SDSP.[5]  At the pertinent times alleged in Mr. Cody's complaint, this contract attorney was defendant Ashley McDonald. Ms. McDonald had a conflict of interest regarding Mr. Cody, so when Mr. Cody sought legal assistance, the prison hired an alternate attorney, Manuel de Castro, Jr. to advise Mr. Cody.  Defendants advised Mr. Cody on September 25, 2013 that Mr. de Castro would assist him.[6]

Two days later, Mr. Cody wrote to Mr. de Castro, telling him he needed legal advice in drafting a § 1983 complaint against the DOC and the South Dakota Department of Health (DOH).  See Docket No. 56-3 at p.1.  Mr. Cody explained what role the DOH has in connection with inmates in the custody of

---

[5] The SDSP is located in Sioux Falls, South Dakota.

[6] Mr. Cody and defendants each submit general characterizations about the relationship between Mr. de Castro and Mr. Cody and the information they exchanged.  Because the parties disagree about virtually all of these characterizations, the court takes the following information from copies of the actual documents exchanged between Mr. Cody and Mr. de Castro.

DOC and explained the issues he had with DOC and DOH regarding his medical care.  Id. at p. 2.  These issues largely mirror the allegations in this federal complaint.  Compare id. at pp. 2-3, with Docket No. 1 at ¶ 23.  Mr. Cody also told Mr. de Castro the DOC had denied him the right to see, read, note and copy reports of outside medical consultants.  Docket No. 56-3 at p. 4.  Mr. Cody explained he wanted Mr. de Castro's help in drafting a complaint to present all of the above issues because he did not know how to frame the issues.  Id.  In addition, Mr. Cody requested Mr. de Castro to provide him with copies of eight specific cases, for which Mr. Cody supplied the full case name and citation information.[7]  Id.

Mr. Cody waited two weeks to hear from Mr. de Castro.  When no response was forthcoming, Mr. Cody wrote to him again on October 11, 2013.  See Docket No. 56-4.  Mr. Cody reminded Mr. de Castro that he was waiting for a response.  Id.  On October 18,2013, Mr. Cody filed a grievance notifying

---

[7] Mr. Cody sought copies of Miller v. Blackwelder, 2008 U.S. Dist. Lexis 60407 (D. Tenn. 2008); Bender v. Regier, 385 F.3d 1133 (8th Cir. 2004); Beerheide v. Suthers, 286 F.3d 1179 (10th Cir. 2002); Crowley v. Hedgepeth, 109 F.3d 500 (8th Cir. 1997); Ashley v. Boyles, 66 F.3d 164 (8th Cir. 1995); Czajka v. Caspari, 995 F.2d 870 (8th Cir. 1993); Flether v. Union Pacific, 621 F.2d 902 (8th Cir. 1980); and Reck v. Pate, 367 U.S. 433 (1961).  See Docket No. 56-3 at pp. 4-5.  The prison law library contains no copies of case law, so inmates must obtain copies of cases from the contract attorney or, in this case, the substitute.  Inmates are limited to 8 copies of reported cases per month at a cost of 25¢ per page, providing the attorney deems the case to be relevant.  See Docket No. 55-1, DOC Policy 1.3.E.1.

prison officials that Mr. de Castro was not responding to his request for assistance.  Docket No. 56-5.

Prison legal staff contacted Mr. de Castro and he sent Mr. Cody a response on October 22, 2013.  Docket Nos. 56-6, 56-7.  With his letter, Mr. de Castro enclosed copies of the cases Mr. Cody had requested.  Docket No. 56-7. Mr. de Castro advised "if you have any other questions, please contact my office." Id.  Mr. de Castro ignored the first four pages of Mr. Cody's September 27 letter and the request he made for assistance in drafting a complaint. Id. Mr. Cody wrote Mr. de Castro on October 29, 2013, pointing out this omission and asking that Mr. de Castro give him the assistance he requested in preparing his complaint or to advise Mr. Cody if Mr. de Castro did not have the time to render such assistance.  Docket No. 56-8.

On November 10, 2013, Mr. de Castro wrote Mr. Cody in a 3-page letter addressing Mr. Cody's request for help in drafting a complaint.  Docket No. 56-9.  He drafted sample paragraphs setting forth venue and jurisdiction, as well as suggested paragraphs for each of the factual allegations Mr. Cody sought to make. Id.  In addition, Mr. de Castro enclosed a sample of a § 1983 complaint he had drafted in another case.  Docket No. 56-9 at pp. 4-10.  Mr. Cody wrote back to Mr. de Castro thanking him for the assistance.  Docket No. 56-10.

On January 27, 2014, Mr. Cody wrote to Mr. de Castro, enclosing a copy of a draft complaint he wanted Mr. de Castro to review and comment or make changes.  Docket No. 56-11.  The letter included seven specific questions about

10

matters of strategy (whether to file a declaration with the complaint or hold it in reserve for summary judgment practice), whether a particular case (Lee v. Armontraut) was still good law, whether to name the former warden as a defendant even though he had retired, and, significantly, what provisions of the ADA bore on Mr. Cody's complaints.  Id. at pp. 2-3.  Mr. Cody gave Mr. de Castro a list of defendants he wished to name who were no longer employed by DOC or DOH and for whom he requested addresses so as to be able to serve them.  Id. at p. 4.  Mr. Cody suggested that Mr. de Castro could get appointed just to help with service of process and gave Mr. de Castro case law in support of his suggestion.  Id. at p. 5.  Mr. Cody indicated he was still in need of Mr. de Castro's assistance.  Id. at p. 6.

Mr. de Castro sent a letter dated February 10, 2014 acknowledging receipt of Mr. Cody's draft complaint and letter.  Docket No. 56-12.  Mr. Cody wrote back telling Mr. de Castro to take as much time as needed before responding because Mr. Cody was depending upon Mr. de Castro's thoroughness.  Docket No. 56-13.

Mr. de Castro wrote Mr. Cody again on March 14, 2014, enclosing a copy of Mr. Cody's draft complaint with notations and suggestions written on Post-it notes attached thereto.  Docket No. 56-14.  Mr. de Castro said he was still working on Mr. Cody's questions and would respond to those within the next few days.  Id.

Mr. Cody responded in a letter dated April 9, 2014.  See Docket No. 56-15.  He thanked Mr. de Castro for his suggestions and indicated he adopted many of them.  Id.  He reminded Mr. de Castro that he still wanted answers to the questions posed in his January 27 letter.  Id.  Mr. Cody then asked Mr. de Castro about whether a certain equitable remedy might be available to him in his lawsuit.  Id.  He also requested a copy of a 2011 Supreme Court case, Brown v. Plata, 131 S. Ct. 1910 (2011), preferably showing the page cites to United States reports.  Id.

A month later, on May 6, 2014, having received no response from Mr. de Castro, Mr. Cody wrote to him again.  See Docket No. 56-16.  In addition to requesting that Mr. de Castro respond to his earlier requests for advice, Mr. Cody informed Mr. de Castro that he was now being denied any optometric assistance at all, with the result that his sight was rapidly deteriorating.  Id.  Mr. Cody requested immediate help from Mr. de Castro so he could get his lawsuit filed.  Id.

On May 15, Mr. Cody wrote de Castro again, reminding the lawyer that he promised a response to Mr. Cody within "a few days" when the lawyer issued his March 14 letter.  See Docket No. 56-17.  Mr. Cody pointed out that two months had now elapsed with no response from Mr. de Castro.  Id.  Mr. Cody asked for a response.  Id.

On May 20, 2014, Mr. de Castro sent Mr. Cody a letter.  See Docket No. 56-18.  He stated he was unable to find the addresses of the people Mr. Cody

12

had asked for in order to serve them.  Id.  Mr. de Castro enclosed copies of two cases (neither were the Brown Supreme Court case Mr. Cody requested on April 9), and some information about Mary Carpenter, M.D.  Id.

Mr. Cody wrote back on June 3, 2014.  See Docket No. 56-19.  He pointed out that Mr. de Castro had not answered his questions posed in his earlier letters and that the enclosures Mr. de Castro sent were not responsive to Mr. Cody's requests.[8]  Id.  Mr. Cody stated that Mr. de Castro had not assisted him in any meaningful and adequate way as contemplated by Lewis v. Casey, 518 U.S. 343 (1996).  Id.  He stated that Mr. de Castro appeared not to have read Cody's letters and that he was attempting to frustrate Cody's claims with obfuscatory responses and irrelevant enclosures.  Id.  For example, Mr. Cody had previously asked Mr. de Castro on January 27 whether Lee v. Armontrout, 991 F.2d 487 (8th Cir. 1993) was still good law.  Id.  In response, Mr. de Castro did not answer the question, but enclosed a cover page for the case.  Id. [The cover page did not indicate subsequent history for the case.]  In addition, Mr. Cody pointed out that Mr. de Castro had never sent him the copy of the 2011 Brown Supreme Court case he requested.  Id.

On June 10, 2014, Mr. Cody submitted a kite to the prison legal counsel (Ashley McDonald) telling her that Mr. de Castro was not giving him requested legal assistance.  See Docket No. 56-20  Ms. McDonald responded to the

---

[8] Mr. Cody painstakingly set forth his original question or request and set forth Mr. de Castro's response or lack thereof to each issue.  See Docket No. 56-19.

13

grievance on June 17, telling Mr. Cody that she had contacted Mr. de Castro who stated he had responded to Mr. Cody's requests for assistance.  Id. Ms. McDonald further told Mr. Cody that Mr. de Castro had said he would review the correspondence he had received from Cody and make sure nothing had been overlooked.  Id.

On June 12, 2014, before Ms. McDonald issued the above response, Mr. Cody again wrote to Mr. de Castro.  See Docket No. 56-21.  Mr. Cody's intent was not clear.  He stated he could "wait no longer while you procrastinate and attempt to frustrate my claims."  Id.  He stated he must file his complaint.  Id.

On June 15, 2014, again before Ms. McDonald's response to the first grievance was received, Mr. Cody filed another grievance.  See Docket No. 56-22.  In that document, he requested assignment of a new lawyer who would actually read his letters and respond to his requests.  Id.  He stated he could give very specific examples of how Mr. de Castro was nonresponsive and offered to allow Ms. McDonald to read the correspondence between himself and Mr. de Castro.  Id.  Mary Burggraaf, unit coordinator, responded to this grievance on June 19 stating that Mr. de Castro had been responding to Mr. Cody's requests.  Id.

In response, on June 30, Mr. Cody filed a request for administrative remedy in which he detailed 24 unanswered questions he posed to

14

Mr. de Castro, attaching exhibits showing the course of correspondence between himself and Mr. de Castro.  See Docket No. 56-24.

On July 2, 2014, Mr. de Castro wrote Mr. Cody, finally enclosing the copy of the 2011 Brown Supreme Court case previously requested.  See Docket No. 56-26.  The only other issue Mr. de Castro addressed in his one-paragraph letter was the matter of the addresses for defendants for service of process—as to this issue, Mr. de Castro told Mr. Cody to contact the penitentiary for that information.  Id.

On July 3, 2014, Mr. Cody informed Ms. McDonald of his receipt of Mr. de Castro's July 2 letter and its deficiencies in terms of responding to his many requests for assistance.  See Docket No. 56-27.  On July 18, 2014, Mr. Cody wrote directly to Warden Darin Young and Secretary of the DOC Denny Kaemingk, advising both of Mr. de Castro's inadequate assistance.  See Docket No. 56-28.  Various documents were filed by Mr. Cody in connection with his grievance about Mr. de Castro's lack of adequate service.  On July 31, 2014, Unit Coordinator Mary Burggraff wrote to Mr. Cody telling him there was no "process" within the penitentiary for seeking addresses of current or former DOC employees for the purpose of serving them with process; Burggraff wrote "you should seek legal advice on how to handle serving defendants."  See Docket No. 56-33.

On July 31, 2014, Burggraff wrote in response to Mr. Cody's request for an attorney other than Mr. de Castro, that Mr. de Castro "has opted to not

15

continue as the conflict attorney." <u>See</u> Docket No. 56-35.  Burggraaf wrote that "[w]e are in the process of obtaining another [conflict attorney]." <u>Id.</u>

On October 14, 2014, the DOC informed Mr. Cody that it had once again retained attorney Manuel de Castro to provide legal assistance to Mr. Cody.  On October 15, 2014, Mr. Cody sent Mr. de Castro a letter with 10 proposed claims and 8 detailed, specific questions.  <u>See</u> Docket Nos. 56-44 & 56-45. Mr. Cody expressed a desire to begin his relationship with Mr. de Castro "anew" and asked Mr. de Castro to please respond to Mr. Cody's requests in the letter.  <u>Id.</u>

On November 3, 2014, Mr. Cody wrote to Mr. de Castro noting that he had not received a response to his October 15 letter and assuming that, by not responding, Mr. de Castro was again choosing not to represent Mr. Cody.  <u>See</u> Docket No. 56-46.  On November 19, 2014, Mr. de Castro acknowledged receiving Mr. Cody's letters and assured Mr. Cody that he would respond "within the next few business days." <u>See</u> Docket No. 56-47.  On November 20, 2014, Unit Coordinator Mary Burggraff wrote Mr. Cody that Mr. de Castro was still the conflict attorney and that he had not expressed any intent to decline representation of Mr. Cody.  <u>See</u> Docket No. 56-48.

On November 23, 2014, Mr. Cody submitted a request for administrative remedy protesting that he had never received adequate legal assistance from Mr. de Castro.  <u>See</u> Docket No. 56-49.  Warden Young responded on December 8, 2014, expressing doubt about what, exactly, legal assistance Mr. Cody was

requesting and stating that "Mr. de Castro has not received a response from you at this time."  See Docket No. 56-50.  Although Mr. de Castro assured Mr. Cody on November 19 that he would respond to his queries shortly, Mr. de Castro never wrote to Mr. Cody again.  Mr. Cody did not write to attorney de Castro again after his letter of November 3.

**B.      The Complaint**

William Cody alleges three claims against defendants in their official "or" individual capacities:  (1) defendants deprived him of adequate legal assistance; (2) defendants denied him access to his own medical reports by retained medical consultants; and (3) defendants intercepted mail sent to him by medical persons and kept it or destroyed it or otherwise prevented Mr. Cody from receiving it.  See Docket No. 1 at p. 2.  These actions are alleged to have violated Mr. Cody's First Amendment and Fourteenth Amendment right of access to the courts.  For relief, Mr. Cody seeks injunctive and declaratory relief.  He does not seek monetary relief other than reimbursement for fees and costs incurred in filing the lawsuit.

## DISCUSSION

**A.      Summary Judgment Standard**

Mr. Cody moves for the entry of summary judgment in his favor.  See Docket No. 26.  Defendants move for the entry of summary judgment in their favor too.  See Docket No. 41.

17

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party. See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp., 600 F.3d 954, 957 (8th Cir. 2010) (per curiam). Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Anderson, 477 U.S. at 256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

18

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment. Anderson, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citing 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FED. PRACTICE & PROCEDURE § 2725, at 93–95 (3d ed. 1983)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247–48.

Essentially, the availability of summary judgment turns on whether a proper jury question is presented: "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. Though *pro se* litigants like Mr. Cody are entitled to a liberal construction of their pleadings, Fed. R. Civ. P. 56 remains equally applicable to them. Quam v. Minnehaha Co. Jail, 821 F.2d 522, 522 (8th Cir. 1987).

The mere fact that both parties have filed cross-motions for summary judgment does not necessarily mean that no genuine dispute of a material fact exists; nor do cross-motions constitute a stipulation to the court's disposition

19

of the case by motion.  <u>Wermager v. Cormorant Twp. Bd.</u>, 716 F.2d 1211, 1214 (8th Cir. 1983); <u>Barnes v. Fleet Nat'l. Bank</u>, 370 F.3d 164, 170 (1st. Cir. 2004). Rather, cross-motions for summary judgment require the court to evaluate each motion independently and determine whether that movant is entitled to judgment as a matter of law.  <u>C. Line, Inc. v. City of Davenport</u>, 957 F. Supp. 2d 1012, 1024-25 (S.D. Iowa 2013); <u>St. Luke's Methodist Hosp. v. Thompson</u>, 182 F. Supp. 2d 765, 769 (N.D. Iowa 2001).

## B.    Denial of Access to the Courts

Prisoners have a constitutional right of access to the courts premised upon the Due Process Clause of the Fourteenth Amendment.  <u>Bounds v. Smith</u>, 430 U.S. 817, 821 (1977), <u>overruled in part</u> <u>Lewis v. Casey</u>, 518 U.S. 343, 354 (1996).[9]  This includes the right by prisoners to pursue direct appeals of their convictions, to seek habeas relief, and to file civil rights actions.  <u>Id.</u> at 821-23. This right imposes an obligation on prison authorities to provide indigent inmates with paper and pen to draft legal documents, notary services, and stamps to mail court documents.  <u>Id.</u> at 824-25.  Prisoners, no less than lawyers, must "know what the law is in order to determine whether a colorable claim exists, and if so, what facts are necessary to state a cause of action."  <u>Id.</u> at 825.  Thus, the right of access to the courts requires prison officials to make

---

[9] The <u>Lewis</u> Court overruled statements in <u>Bounds</u> that suggested that the right of access to the courts required states to enable prisoners to *discover* grievances and to *litigate effectively* once in court.  <u>Lewis</u>, 518 U.S. at 354.

20

some avenue available to inmates to determine what the law is.  Id.  Prison officials may protect this right by either providing prisoners with adequate law libraries, or providing them with assistance from persons trained in the law— although other methods might also pass constitutional muster.  Id. at 828.  See also Lewis, 518 U.S. at 351.

In addition to showing that legal information or assistance provided by the prison is insufficient, a prisoner asserting a claim of violation of his right of access to the courts must establish an "actual injury."  Lewis, 518 U.S. at 351-52; Moore v. Plaster, 266 F.3d 928, 933 (8th Cir. 2001) (citing Klinger v. Dept. of Corrections, 107 F.3d 609, 617 (8th Cir. 1997)).  "Actual injury" means "that a nonfrivolous legal claim had been frustrated or was being impeded" by defendants' failure to maintain an adequate law library or to provide adequate legal assistance.  Lewis, 518 U.S. at 352-53; Moore, 266 F.3d at 933 (quoting Johnson v. Missouri, 142 F.3d 1087, 1089 (8th Cir. 1998)).

The Lewis Court emphasized the types of cases outlined in Bounds to which the right of access to the courts applies:  direct appeals of criminal convictions, habeas petitions, and civil rights actions to vindicate basic constitutional rights.  Lewis, 518 U.S. at 354.  Thus, if a prison elects to provide a law library to its inmates, it need not provide every volume of the United States Code, most volumes of which concern federal laws that have no relation to prison inmates.  Id. at 355.  Likewise, access to legal resources concerning shareholder-derivative actions and slip-and-fall claims would fall

21

outside the purview of the right of access to the courts.  Id.  Legal materials addressing these types of claims are simply outside the scope of materials prisoners need to "attack their sentences, directly or collaterally," or "to challenge the conditions of their confinement," matters that are at the heart of the right of access to the courts.  Id.  Denial of legal resources regarding these extraneous topics "is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration."  Id.  The Lewis and Bounds decisions upheld the right of prisoners to access to law libraries or legal assistance in order to pursue civil rights claims.  Lewis, 518 U.S. at 354; Bounds, 430 U.S. at 821-23.  This court has held that claims arising under Title II of the ADA are the type of civil rights claims to which the right of access to the courts applies.  See Docket No. 31 at pp. 13-14 (citing Tennessee v. Lane, 541 U.S. 509, 523 (2004); Lewis, 518 U.S. at 354; Bounds, 430 U.S. at 821-23).

Defendants make three arguments for dismissal of Mr. Cody's access to the courts claim.  First, they argue Mr. Cody failed to exhaust his administrative remedies.  Second, they argue defendants provided Mr. Cody with adequate access to legal assistance through attorney Manuel de Castro.  Third, defendants argue Mr. Cody has no actual injury.  Mr. Cody disputes each of these assertions.

### 1.    Exhaustion of Administrative Remedies

Defendants argue that Mr. Cody has failed to exhaust his administrative remedies in two ways.  As to his claim that the materials in the prison law library are inadequate because no ADA materials are available, defendants argue no grievance was ever filed.  As to his claim that Mr. de Castro provided inadequate legal advice, defendants argue that Mr. Cody's grievances were not timely filed.

### a.    The Law of Exhaustion in Prison Litigation

In 1996 Congress enacted the Prison Litigation Reform Act, 110 Stat. 1321-71, as amended, 42 U.S.C. § 1997e *et seq*, in order to reduce frivolous litigation emanating from the nation's prisons.  Woodford v. Ngo, 548 U.S. 81, 84 (2006).  One part of that Act was codified at 42 U.S.C. § 1997e(a) which requires administrative exhaustion as follows:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

See 42 U.S.C. § 1997e(a).

Exhaustion under § 1997e(a) is mandatory, requires prisoners to exhaust all "available" remedies, and is required even where the relief sought (i.e. money damages) is not available through administrative avenues.  Woodford, 548 U.S. at 85.  Exhaustion is required for any suit challenging prison conditions, even if the suit is not brought under § 1983.  Id.  "Prison conditions" means "all inmate suits about prison life, whether they involve

general circumstances in prison or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002).  Finally, in order to satisfy § 1997e(a), the prisoner must properly exhaust.  Woodford, 548 U.S. at 93.  It is not sufficient for the prisoner to show that, although he has procedurally defaulted his administrative claim, there is no further avenue of administrative action open to him.  Id. at 93-103.

Failure to exhaust administrative remedies is an affirmative defense which the defendant must plead and prove.  Jones v. Bock, 549 U.S. 199, 212 (2007).  The PLRA itself contains no requirement that every defendant named in the § 1983 lawsuit have previously been named in the prisoner's administrative complaint.  Id. at 217-18.  Rather, whether a prisoner has properly exhausted must be determined from the prison regulations themselves.  Id. at 218-19.  Those regulations, not the PLRA, "define the boundaries of proper exhaustion." Id. at 218.

Although a prisoner is not required to plead facts supporting exhaustion in his or her complaint, dismissal at the screening stage for failure to exhaust may be allowed if the allegations in the complaint show conclusively that the affirmative defense is established in a particular case.  Id. at 215-16.  If a complaint contains both exhausted and unexhausted claims, the court should decide the exhausted claims on their merits and dismiss without prejudice the unexhausted claims.  Id. at 224.

24

In <u>Chelette v. Harris</u>, 229 F.3d 684, 685-86 (8th Cir. 2000), a prisoner brought an action pursuant to § 1983, alleging that he had received inadequate medical treatment of his wrist following an altercation with another inmate. Chelette "alerted prison warden Grant Harris to the problem."  <u>Id.</u> at 686. According to Chelette, Harris assured Chelette that the problem "would be taken care of."  <u>Id.</u>  When Chelette allegedly received inadequate medical care, he filed a complaint in federal district court seeking damages and injunctive relief.  <u>Id.</u>  Chelette did not follow the state prisoner grievance procedure because, he wrote, "Warden Harris stated he would take care of the matter," thus leading Chelette to believe he did not have to follow the administrative procedure.  <u>Id.</u>

Although the Eighth Circuit held that exhausting administrative procedures was not an issue touching on the court's subject matter jurisdiction, nevertheless it was an important requirement bearing on the timing of when prisoners' complaints could be brought to federal court.  <u>Id.</u> at 686-88.  Once a defendant files a motion to dismiss based on failure to exhaust, it is incumbent on the court to determine whether the prisoner in fact did exhaust.  <u>Id.</u> at 688.  In Chelette's case, the court held he clearly did not exhaust.  <u>Id.</u>  "If administrative remedies are available, the prisoner must exhaust them," without regard to the prisoner's subjective beliefs, whether those beliefs are logical or not.  <u>Id.</u>  Since Chelette did not exhaust, the court dismissed his complaint without prejudice.  <u>Id.</u>  The court must examine the

adequacy of a prisoner's efforts at exhaustion as of the time the complaint was filed in federal court.  Johnson v. Jones, 340 F.3d 624, 627 (8th Cir. 2003).

In a similar case, a prisoner, Lyon, brought suit under § 1983 alleging prison officials violated his First Amendment rights by excluding him from participating in Jewish services.  Lyon v. Vande Krol, 305 F.3d 806, 807 (8th Cir. 2002) (*en banc*).  Prior to filing his suit in federal court, Lyon protested his exclusion to the prison's chaplain.  Id. at 808.  The chaplain explained to Lyon that he was being excluded based upon the recommendation of a Rabbi who acted as a Jewish consultant to the prison.  Id.  Lyon then wrote a memo to the warden of the prison; the warden responded that prisoners who had not converted to Judaism would, at the recommendation of the prison's Jewish experts, not be allowed to participate in Jewish services, although they could engage in a course of Jewish study.  Id.  Lyon admitted he knew of the prison grievance procedure, but he did not comply with it because prison officials implied the decision did not rest in their hands, but rather in the hands of Jewish experts.  Id.

The Eighth Circuit held Lyon's case must be dismissed.  Id. at 809. Although prison officials may not prevent inmates from exhausting their remedies, the court held that defendants had not prevented Lyon from exhausting his remedies.  Id. at 808-09.  Furthermore, the court relied upon Chelette in holding Mr. Lyon's subjective beliefs about whether any meaningful relief could be obtained through the administrative process were irrelevant.  Id.

26

at 809.  The court noted there was an administrative procedure available; Lyon knew about the procedure; Lyon chose not to follow the procedure; and defendants never told Lyon that no procedure existed.  Id.  Under these facts, then, dismissal for failure to exhaust was required.  Id.

In a case decided just this year, Porter, a prisoner, filed a grievance which, under prison rules, the warden was to respond to within 40 days after receipt.  See Porter v. Sturm, 781 F.3d 448, 450 (8th Cir. 2015).  The warden did not respond for more than 14 months.  Id. at 451.  The prisoner did not appeal from the warden's response, although he had a right to under the prison's administrative procedures; instead Porter brought suit in federal court. Id.  Porter tried to excuse his failure to exhaust by arguing that prison officials withheld grievance procedures from him and that such procedures would be ineffective.  Id. at 451-52.  The Eighth Circuit rejected these excuses, noting the delays did not cause remedies to be unavailable and defendants had not prevented Porter from appealing.  Id.  Porter knew of his ability to appeal and chose not to pursue it.  Id.  Accordingly, the court held Porter's complaint must be dismissed without prejudice.  Id. at 452-53.

The inadequacy of a prison library is an issue that must be addressed through the administrative exhaustion procedure.  Woodford, 548 U.S. at 85 (exhaustion required even though the remedy sought may be unavailable through the administrative process).  See also Kerkhove v. South Dakota DOC, 2005 WL 2046013, Civ. No. 99-4045 (D.S.D. Aug. 22, 2005) (administrative

27

exhaustion requirement applied to plaintiff Ashker's claim that defendants violated his right of access to the courts).  This court must judge whether exhaustion was complete as of the date Mr. Cody filed his complaint.  Johnson, 340 F.3d at 627.  That date was October 14, 2014.  See Docket No. 1.

### b.    Exhaustion of the Law Library Issue

Mr. Cody counters defendants' assertion that he has never grieved the adequacy of the law library by alleging he filed grievances in connection with this topic on August 12, 1996; October 25, 2001; April 11, 2004; and March 25, 2005.   He also argues that the grievances he filed in connection with the unresponsiveness of his contract attorney serve to exhaust this claim.

The dispute between defendants and Mr. Cody as to whether Mr. Cody properly exhausted his administrative remedies lies in the level of specificity of Mr. Cody's grievances and the timing of those grievances.  Mr. Cody claims grievances complaining about the lack of an adequate law library or access to an adequate alternative are sufficiently specific without having to mention the lack of ADA or other legal materials in the library.  As to this level of generality, Mr. Cody asserts he has submitted numerous recent grievances.  Defendants argue that Mr. Cody has not exhausted administrative remedies because he never submitted a grievance regarding the lack of ADA materials (or any other materials) in the prison law library.

The DOC policy describing inmates' administrative remedy procedure does not address the level of specificity required in an IRR or and AR.  See

Docket No. 42-6.  As is evident from the above discussion of the law, a right of access to the courts may be frustrated in a number of ways—by denying an inmate paper upon which to write his court claim, stamps with which to mail the complaint to the court, or access to the law itself.  Bounds, 430 U.S. at 821.  Thus, the court holds that Mr. Cody's grievances must have contained a reasonable degree of specificity so as to allow defendants to discern in what way he was claiming his right of access to the courts was being denied.

Mr. Cody does not provide the court with copies of his earlier grievances from 1996 through 2005.   Mr. Cody alleges he submitted grievances regarding the inadequacy of the contents of the law library on August 12, 1996 (denied September 3, 1996); on October 25, 2001 (denied November 4, 2001, because no other inmates complained); April 11, 2004 (denied); March 25, 2005 (denied); January 8, 2008 (denied); and July 22, 2010 (denied because complaint was inadequate).  See Docket No. 55 at p. 94, ¶ 356.

The court, for the sake of argument, will assume that these grievances were sufficient to put defendants on notice that the law library was inadequate because it lacked any resources about the ADA.  However, as of the date of the denial of the last grievance on this subject—July 22, 2010—Mr. Cody would have had four years to file suit with this court.  See 28 U.S.C. § 1658. Mr. Cody's complaint in this matter was not filed until October 14, 2014.  See Docket No. 1.  Therefore, even if his earlier grievances served to exhaust his administrative remedies, they are unavailing for purposes of the claims brought

29

herein.  The court then examines the grievances Mr. Cody places before the court which are within the four-year statute of limitations.

On September 19, 2013, Mr. Cody filed an IRR complaining that he was "unable to prepare a civil complaint alleging denial of medical treatment because [he had] previously sued attorney Walter (SDSP Legal Asst.) and have not been appointed an alternate who will assist me." See Docket No. 56-1.  The action requested by Mr. Cody in this IRR was to have "an attorney appointed to assist [him] in preparing a complaint to be filed in fed. dist. ct alleging denials of med. Treatment, inter alia." Id.  Defendants informed Mr. Cody in response to this IRR that Manuel de Castro had been hired to assist him.  See Docket No. 56-2.

On October 18, 2013, Mr. Cody filed another IRR complaining that he had written to Mr. de Castro twice since being notified that he would provide assistance and that Mr. de Castro had never responded.  See Docket No. 56-5. The action requested by Mr. Cody was to be given "adequate legal assistance ASAP." Id.  Defendants assured Mr. Cody four days later that a response would be forthcoming that day from Mr. de Castro.  See Docket No. 56-6.

On June 10, 2014, Mr. Cody submitted a kite, not an IRR, to SDSP legal counsel Ashley McDonald, asking to meet with her because he had been trying to obtain legal assistance from Manual de Castro since September 17, 2013, "to no avail." See Docket No. 56-20.  Mr. Cody wrote that Mr. de Castro "has not answered most of my questions nor [has he] responded to most of my

30

requests." Id.  Mr. Cody specifically told Ms. McDonald that Mr. de Castro had "not answered questions posed on 9/27/13 nor requests for a copy of a case made in April, May & June." Id.  Mr. Cody requested that a different attorney be assigned to help him. Id.  Ms. McDonald contacted Mr. de Castro and relayed to Mr. Cody that Mr. de Castro told her he had been responding to Cody's requests, but that he would read through Mr. Cody's correspondence again and make sure there was nothing he had overlooked. Id.

On June 15, 2014, Mr. Cody submitted an IRR complaining again about Mr. de Castro's unresponsiveness. See Docket No. 56-22.  In his IRR, Mr. Cody offered to provide Ms. McDonald access to all of his correspondence with Mr. de Castro so that she could see the specific examples of what issues Mr. de Castro was ignoring. Id.  This correspondence included Mr. Cody's letter to Mr. de Castro asking what provisions of the ADA were applicable to his medical claims. See Docket No. 56-11 at pp. 2-3.

Burggraaf simply responded to this IRR that Mr. de Castro was responding to Mr. Cody's requests for assistance. See Docket No. 56-23. Mr. Cody appealed from Burggraaf's response by filing an AR. See Docket No. 56-24.  He attached a six-page summary detailing the issues he requested assistance with and never got a response from Mr. de Castro and requests for copies of cases or other information never provided. Id.  Mr. Cody also provided these attachments to Ms. McDonald. See Docket No. 56-25.

31

On July 28, 2014, Mr. Cody filed an IRR asking defendants to return to him the copies of his correspondence with Mr. de Castro that he had previously given them.  See Docket No. 56-31.  On August 20, 2014, defendants granted this request.  See Docket No. 56-41.

On July 30, 2014, Mr. Cody filed an IRR complaining that Mr. de Castro was not helping him "in preparing a complaint to file in federal district court alleging denials of meds & treatment diagnosed as serious medical conditions." See Docket No. 56-32.  The action he requested was to have "access to an attorney who will respond to my requests" and "assist me in the preparation of a complaint & filing in the federal district court alleging denials of necessary, diagnosed medical problems." Id.  On July 31, 2014, Burggraaf responded that Mr. de Castro had quit and defendants were in the process of obtaining another attorney to assist Mr. Cody.  See Docket No. 56-35.  On August 20, 2014, defendants notified Mr. Cody that they were still looking for a replacement attorney.  See Docket No. 56-42.

Sometime prior to October 6, 2014, defendants notified Mr. Cody that Mr. de Castro had again been hired to help him.  On October 6, 2014, Mr. Cody filed the final IRR prior to the initiation of this lawsuit.  See Docket No. 56-43. In that grievance, he informed defendants he had contacted Mr. de Castro twice since he had been re-hired and Mr. de Castro had not responded to either inquiry.  Id.  Mr. Cody reiterated his complaint that he was—and had been— denied access to adequate legal counsel since he first requested such

32

assistance on September 25, 2013.  Id.  He requested an alternate attorney who was adequate under Lewis and Bounds.  Id.  Mr. Cody filed his lawsuit with this court on October 14, 2014.  See Docket No. 1.

The parties urging the issue of exhaustion of administrative remedies are the defendants.  Thus, as to this issue, the court views the facts in the light most favorable to Mr. Cody.  The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party.  See Matsushita Elec. Co., 475 U.S. at 587–88 (citing Diebold, Inc., 369 U.S. at 655); Helton, 600 F.3d at 957 (court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party).  Viewing the facts in that light, the court finds that summary judgment is inappropriate in favor of defendants on this issue.  Mr. Cody clearly sought legal advice from Mr. de Castro regarding the ADA.  See Docket No. 56-11 at pp. 2-3.  That information was clearly not given by Mr. de Castro.  And that fact was clearly evident to defendants who were given copies of all of the correspondence between Mr. Cody and Mr. de Castro.  Defendants examined, or had the opportunity to examine, that correspondence at their leisure for nearly two months—from June 30 until shortly after August 20.  Therefore, defendants knew Mr. Cody was seeking legal information about the ADA, that he was not getting it from Mr. de Castro, and that ADA resources were not in their law library.  This court respectfully recommends defendants' motion to dismiss Mr. Cody's access to the courts claim on exhaustion grounds be denied.

### c.    Timeliness of Exhaustion

Defendants argue that Mr. Cody waited until July 13, 2014 to grieve the allegedly inadequate assistance he was receiving from Mr. de Castro.  See Docket No. 42 at p. 14.  Because under DOC policy grievances must be filed within 30 days of the incident which gives rise to the grievance, defendants argue that Mr. Cody failed to properly exhaust.

This argument is based upon a misrepresentation of the record.  The record shows, as detailed above, that Mr. Cody filed his first IRR complaining about attorney de Castro's nonresponsiveness on October 18, 2013.  See Docket No. 56-5.  This was after defendants notified Mr. Cody on September 27, 2013 that Mr. de Castro would provide him with legal assistance, and after Mr. Cody wrote two letters to Mr. de Castro and had not received any response.  Thus, this complaint was well within the 30-day limit defendants assert.

Furthermore, after these events, Mr. Cody received partial responses from Mr. de Castro and assurances of future complete responses during the course of their correspondence.  It was only in late spring 2014 that it became evident that Mr. de Castro was not going to provide answers to the lion's share of Mr. Cody's inquiries and requests for assistance.  The last letters between Mr. Cody and Mr. de Castro during this phase of their association took place on May 20 and June 3, 2014.  The May 20 letter from de Castro to Mr. Cody again ignored many of his prior, detailed and repeated inquires and requests.  Compare Docket Nos. 56-15, 56-16, & 56-17 with Docket No. 56-18.

34

Mr. Cody's final letter to Mr. de Castro on June 3 set forth in detail the outstanding requests he had posed to Mr. de Castro which Mr. de Castro had ignored.  See Docket No. 56-19.  When Mr. de Castro did not respond again, Mr. Cody then filed an IRR complaining about Mr. de Castro's nonresponsiveness on June 15, 2014.  See Docket No. 56-22 (to which defendants responded on June 19, 2014—see Docket No. 56-23).  Mr. Cody followed up on this unsuccessful IRR by filing an AR on June 30, 2014.  See Docket No. 56-24.

The record reflects that Mr. Cody exhausted his administrative remedies with regard to the alleged inadequacy of Mr. de Castro's assistance.  He gave Mr. de Castro a full and fair opportunity to render assistance.  When it became evident, finally, that Mr. de Castro was not going to answer many of Mr. Cody's questions and requests, Mr. Cody promptly grieved this issue within 30 days.

## 2.    Adequacy of Access Through Mr. de Castro

As is clear from an examination of the correspondence between Mr. Cody and Mr. de Castro, there were numerous requests and questions posed by Mr. Cody for which he received no response or an inadequate response.  Among those are the following:

● Mr. Cody requested information about how the ADA applied to the facts of his medical claims; Mr. de Castro never mentioned the ADA in any of his letters nor did he enclose any documents describing the ADA.

35

- Mr. Cody asked whether <u>Lee v. Armontraut</u> was still valid law; Mr. de Castro never answered this question but instead sent a copy of the cover sheet of the opinion in <u>Lee v. Armontraut</u> which bore no indication on it of the continued validity of that case as good law.

- Mr. Cody asked Mr. de Castro whether he should name the former warden as a defendant even though he had retired; Mr. de Castro never responded.

- Mr. Cody asked whether he should file a declaration along with the complaint or whether it was advisable to hold that affidavit for use in summary judgment practice; Mr. de Castro never responded.

- Mr. Cody asked Mr. de Castro to help him find addresses for defendants who were no longer employed by the DOC so that he could serve them with process; Mr. de Castro erroneously told Mr. Cody that there was a process in place within the penitentiary to obtain this information, a fact defendants made clear to Mr. Cody was not true through the administrative grievance process (Mr. Cody never received these addresses).

- Mr. Cody asked Mr. de Castro about the applicability of a particular equitable remedy; Mr. de Castro never responded.

- Mr. Cody requested a copy of a First Circuit prisoner case decided January 17, 2014 in which one of the parties' names was "Kosilek"; Mr. de Castro sent Mr. Cody a copy of a *1996 state court* case from Massachusetts in which a party had the same name.

36

- Mr. Cody asked for the DOH address for Dr. Mary Carpenter so that he could serve her with process; Mr. de Castro sent Mr. Cody a printout for Dr. Carpenter from her private employer's website.

- Mr. Cody asked for the address for DOH Secretary Hollingsworth; Mr. de Castro never responded.

- Mr. Cody asked whether there was any Eighth Circuit case law concerning the ratio of the number of prisoners to a medical doctor and whether prison administrators could substitute a physician's assistant or a certified nurse practitioner in place of a medical doctor; Mr. de Castro never responded.

- Mr. Cody asked whether it was constitutional for a registered nurse to assume the role of gatekeeper in determining whether a prisoner had access to a medical doctor; Mr. de Castro never responded.

Not only did Mr. Cody fully and fairly ask Mr. de Castro for the above information and advice, but when the information was not forthcoming, Mr. Cody reminded Mr. de Castro of what issues remained to be responded to. And still he did not receive most of what he asked for.

Defendants maintain that Mr. Cody received adequate legal assistance from Mr. de Castro because Mr. de Castro did respond to some of his requests. Defendants argue the assistance Mr. de Castro rendered to Mr. Cody was constitutionally adequate and did not deprive him of his right of access to the courts.

37

When the <u>Bounds</u> Court used the term "adequate" in the phrase "adequate assistance from persons trained in the law," adequate "refers not to the effectiveness of the representation, but to the adequacy of the prisoner's access to his or her court-approved counsel or other law-trained assistant." <u>Schrier v. Halford</u>, 60 F.3d 1309, 1313-14 (8th Cir. 1995).

The <u>Bounds</u> Court gave several examples of what the Court had in mind by "adequate assistance"--professional or quasi-professional legal assistance in a form not dictated by the Court but including:

● training of inmates as paralegal assistants to work under lawyers' supervision

● the use of paraprofessionals and law students

● volunteer attorneys through bar associations or other groups

● hiring part-time lawyers to consult

● hiring full-time staff attorneys

<u>Bounds</u>, 430 U.S. at 830-31.

The Second Circuit has examined the term "adequate assistance" from the <u>Bounds</u> opinion in comparison with the term "effective assistance" from Sixth Amendment jurisprudence. <u>See</u> <u>Bourdon v. Loughren</u>, 386 F.3d 88 (2d Cir. 2004). The two phrases derive from different constitutional sources and have different aims.

The court noted the right to "effective assistance" derives from the Sixth Amendment right to have counsel in criminal prosecutions. <u>Id.</u> at 95. The

38

Sixth Amendment right to effective assistance guarantees the right to be heard on criminal charges.  Id. at 96.  The right of access to the courts is rooted in the equal protection and due process clauses of the Fifth and Fourteenth Amendments.  Id. at 95.  That right is a right by prisoners not to be impeded from presenting claims for formal adjudication by a court.  Id. at 96.

Both standards, the court held, "impose a certain minimum standard of 'assistance,'" but they "are not synonymous."  Id.  The Sixth Amendment right to effective assistance of counsel guarantees that the defendant receives a fair trial.  Id. at 96-97.  The right of access to the courts "refers to the capability of qualified and trained persons—rather than legal amateurs and laypersons—to provide, in dispensing legal assistance, access to the courts."  Id. at 98.  Thus, a § 1983 plaintiff asserting a denial of the right of access to the courts "must show that, on the facts of his case, the provision of counsel did not furnish him with the capability of bringing his challenges before the courts, not that he was denied effective representation in the court."  Id. (citing Schrier, 60 F.3d at 1313-14).

The facts of the Bourdon case showed that the plaintiff was not restricted from contacting his attorney, the attorney was capable of bringing Bourdon's case before the courts, and that Bourdon never requested any legal materials from his attorney to assist himself in bringing his matter before the courts himself.  Id. at 98-99.  On these facts, the court held that Bourdon was afforded "adequate assistance" from the lawyer provided to him.  Id. at 99.

39

Relying on the mere fact that defendants provided Mr. de Castro's services to Mr. Cody, and that Mr. de Castro responded to some of Mr. Cody's requests, defendants urge this court to conclude as a matter of law that Mr. Cody received "adequate assistance" of counsel.  Defendants rely heavily on the Eighth Circuit Schrier case, emphasizing that physical access to an attorney is all that is required, regardless of the content of the advice given by the attorney pursuant to that contact.

Mr. Cody argues that Schrier was decided before the Supreme Court decided Lewis and that the Lewis Court effectively overruled Schrier.  In Lewis, the Arizona DOC argued that Bounds required only that the DOC provide prisoners with an adequate law library.  Lewis, 518 U.S. at 356.  Because the prison law library was clearly adequate, the Arizona DOC argued it had no duty under Bounds to provide additional measures to assist illiterate or non-English-speaking prisoners.  Id.  The Lewis Court rejected this argument soundly, stating that merely providing *physical access* to law books by prisoners was not sufficient where the prisoners in question could "turn the pages" in a law book, but could not read or understand the words on those pages.  Id.  The right of access to the courts was about providing prisoners with the "reasonably adequate opportunity to file nonfrivolous legal claims," and if the DOC did not provide that opportunity, it was not complying with constitutional mandates.  Id.

40

Without going into every alleged deficiency asserted by Mr. Cody, the court declines to adopt defendants' argument that merely providing physical access to an attorney satisfied defendants' obligation under the constitution regardless of the substance of the advice and assistance conveyed by the attorney. The one glaring omission of requested assistance that fairly jumps out from this record is that Mr. Cody asked Mr. de Castro on several occasions for information about the ADA so that he could see how, or if, his claims could be brought under that act. Defendants have not disputed that the prison law library contains no information about the ADA. A review of the correspondence between Mr. Cody and Mr. de Castro shows that, despite Mr. Cody's requests, Mr. de Castro never provided any information or copies of reference material concerning the ADA. This case is thus distinguishable from Bourdon where the plaintiff never asked his lawyer to provide him with legal materials. Here, Mr. Cody did ask for such legal materials and he never received them.

Defendants argue Mr. Cody does not need to know the law, because under Federal Rule of Civil Procedure 8, he only needs to set forth a short and concise statement of the facts. That same argument was made, and rejected, in Bounds. As the Bounds Court said, "[i]t would verge on incompetence for a lawyer to file an initial pleading without researching" and "a lawyer must know what the law is in order to determine whether a colorable claim exists, and if so, what facts are necessary to state a cause of action." Bounds, 430 U.S. at 825. "If a lawyer must perform such preliminary research, it is no less vital for

41

a pro se prisoner." Id. at 825-26.  At least as to Mr. Cody's claim that he was

denied adequate assistance on his potential ADA claim, the court rejects both

parties' invitation to rule on that issue as a matter of law.  The mere fact that

Mr. de Castro was assigned to help Mr. Cody and that he responded to some of

Mr. Cody's requests does not resolve the issue as a matter of law.

### 3.   Actual Injury

Defendants argue Mr. Cody has failed to show "actual injury."  "Actual

injury" means "that a nonfrivolous legal claim had been frustrated or was being

impeded" by defendants' failure to maintain an adequate law library or to

provide adequate legal assistance.  Lewis, 518 U.S. at 352-53; Moore, 266 F.3d

at 933 (quoting Johnson, 142 F.3d at 1089).  On the record before this court,

there are two possible legal claims that Mr. Cody relies upon to show actual

injury:  (1) a 2005 § 1983 lawsuit in this court styled Cody v. Severson,  4:05-

cv-4105-KES (D.S.D.) and (2) his current complaints about the lack of medical

care in prison as set forth in paragraph 23 of his complaint.  Neither claim,

however, suffices to show actual injury.

### a.   The Severson Lawsuit

Mr. Cody alleges his claim in the Severson case was dismissed because

he sued a state court judge, believing he had a right to do so if he were asking

for only prospective injunctive relief.  See Docket No. 27 at pp. 1-2.  Mr. Cody

alleges defendants did not have adequate legal resources in the prison law

library that would have enabled him to learn that Judge Severson was

42

protected by the doctrine of judicial immunity.  Mr. Cody makes no allegation that Mr. de Castro or any other lawyer mislead or misinformed him regarding the Severson lawsuit.

The Severson lawsuit was dismissed on December 14, 2005.  Severson, Docket Nos. 7, 9 & 10.  As discussed above, the statute of limitations for bringing a § 1983 lawsuit is three years.  Wilson, 471 U.S. at 275, 279-80; SDCL §§ 15-2-14 and 15-2-15.2.  Mr. Cody initiated this lawsuit on October 14, 2014, well outside the three-year statute of limitations for bringing a denial of access to the courts claim based on the Severson case and its outcome.  Furthermore, the wrongdoing, if any, on the part of defendants was clearly known to Mr. Cody as of December 14, 2005, so the possibility of tolling for fraudulent concealment is inapplicable.

Mr. Cody argues his reliance on the Severson matter was intended to show "that he had been impeded by Defendants' failure to maintain an adequate law library, thus creating an actual injury, for which there is no statute of limitations."  See Docket No. 51 at p. 23.  Mr. Cody's assertion that no statute of limitations applies is misplaced.  The lack of an adequate law library as an adjunct to a right of access to the courts claim does not exist in the abstract.  As explained above, an allegedly inadequate law library must be coupled with an "actual injury" in order to establish a *prima facie* case.  The Severson case cannot constitute an "actual injury" because the dismissal of that case came outside of the limitations period for the instant lawsuit.

43

### b.    Current Medical Issues

In paragraph 23 of Mr. Cody's complaint, he sets forth a number of medical issues he has and alleged deficiencies in defendants' responses to those medical issues.  See Docket No. 1 at ¶ 23, pp. 8-9.  However, it is clear that Mr. Cody is **not** asserting an Eighth Amendment deliberate indifference claim in his complaint.  Id. at ¶¶ 51-53, pp. 19-20.  The reason Mr. Cody recites the litany of medical issues in paragraph 23 is to show "actual injury" in that he was forced to prepare his complaint about the medical issues *pro se* because he could not get adequate assistance from either the prison law library or from Mr. de Castro.  Id. at ¶ 23, p. 8.

It is clear from reviewing the correspondence between Mr. Cody and Mr. de Castro that the substance of their discussions was indeed a complaint pursuant to § 1983 regarding the medical care Mr. Cody received from defendants.  Mr. Cody apparently never filed that complaint.  No complaint is pending in this court alleging a deliberate indifference or ADA claim.  Nor does either party inform the court that a complaint of that nature was filed by Mr. Cody in any other forum.  The allegations in paragraph 23 of Mr. Cody's complaint do not contain dates, so the dates on which the medical care about which he complains are unknown.

Mr. Cody is required to show "actual injury" by showing that "a nonfrivolous legal claim had been frustrated or was being impeded" by defendants' failure to provide him adequate legal assistance.  Mr. Cody has not

done this.  Based on the record before the court, it appears as though even now Mr. Cody would be entitled to file a § 1983 deliberate indifference or ADA claim based on his medical issues.  If it is still possible to file such a complaint, it is impossible for the court to see how claims in that complaint have already been frustrated or impeded by defendants.  Accordingly, the court recommends granting summary judgment to defendants on Mr. Cody's right of access to the courts claim because Mr. Cody has not shown "actual injury."

**C.  Access to Medical Reports**

As detailed above, Mr. Cody alleges that defendants have denied him access to reports from outside medical consultants and access to decisions by prison doctors about *why* certain medical treatment or medical supplies were denied to him.  Defendants argue that their policy denying Mr. Cody direct access to medical records is supported by legitimate penological interests and is constitutional.

First, the court clarifies what the claim is before it.  Mr. Cody alleged in his complaint that he had been denied access to Dr. Griess' March 28, 2014 report.  See Docket No. 1 at pp. 13-16.  Mr. Cody admitted that, after discussion with defendants, he was given this report on June 9, 2014.  Id. Furthermore, Mr. Cody alleges that defendants and he agreed upon a kite procedure to use in the future if Mr. Cody requested reports from outside medical providers.  Id.  Mr. Cody also stated in his complaint that he was

45

denied access to UMs in his medical file but, after submitting an IRR grieving this issue, he was given access to UMs in his file on August 4, 2014.  Id.

Mr. Cody amended his complaint once since it was first filed, on December 11, 2014.  See Docket No. 12.  However, Mr. Cody's amendment contained no new facts or allegations concerning the denial of access to medical records claim.  Id.  Specifically, although Mr. Cody alleged in other pleadings that defendants continued to deny him access to reports of outside medical providers (see Docket No. 23 at p. 19—brief in response to defendants' motion to dismiss), this allegation is not part of Mr. Cody's complaint.[10]  See Docket No. 1.  Nor has Mr. Cody moved the court to amend his complaint to include this allegation.  Accordingly, the court restricts its discussion to those issues presented in the complaint:  denial of access to Dr. Griess' March 28, 2014 report and denial of access to UMs.

A denial of right of access to the courts based on denial of access to medical records is subject to the same *prima facie* case as discussed above— that is, Mr. Cody must show that he suffered an "actual injury."  Martin v.

---

[10] In response to defendants' Rule 12(b)(6) motion to dismiss, Mr. Cody alleged he has not been allowed to receive or review subsequent reports by Dr. Griess dated October 24, November 17, 19, 26 and December 16, 2014.  See Docket No. 23 at p. 19.  Defendants assert that Mr. Cody submitted kites to see Dr. Griess' December 14, 2014 letter and a post-operative report from Dr. Griess dated sometime after his December 16, 2014 surgery.  See Docket No. 42-34 at ¶¶ 15-17.  Defendants allege Mr. Cody was allowed to see these records on January 2, 2015.  Id.  Defendants allege Mr. Cody did not request to view any other records.  Id.

Crall, 2006 WL 515530 *7-8 (W.D. Ky. 2006).  For the same reasons the court recommends granting summary judgment to defendants on Mr. Cody's right of access claim concerning adequate access to legal resources, the court recommends granting summary judgment to defendants on Mr. Cody's claim premised on medical records.  There is no showing in the record that Mr. Cody filed a complaint based on his medical claims and lost due to defendants' actions, nor is there any showing that Mr. Cody is not now able to file such a claim.

**D.    Interference with Mail**

Mr. Cody's third claim is that defendants violated his First Amendment right to receive mail when they withheld Dr. Griess' March 28, 2014 report from him without notice to either himself or Dr. Griess.  See Docket No. 1 at ¶ 53, p. 20.  Mr. Cody relies upon Martinez v. Procunier, 416 U.S. 396, 413-14 (1974), for his position.  The Martinez case was later modified in Thornburg v. Abbott, 490 U.S. 401 (1989)).

Under Martinez, prison regulation of mail between inmates and noninmates had to "further an important or substantial governmental interest unrelated to the suppression of expression."  Martinez, 416 U.S. at 413-14.  The means used to further this governmental interest had to be "no greater than is necessary or essential to the protection of the particular governmental interest involved."  Id.  In addition, prison officials were required to notify the inmate and the noninmate if they rejected a letter.  Id. at 418.

47

As with other areas of the law dealing with prison administration and prisoners' rights, however, the pendulum began to swing in the other direction after cases like <u>Martinez</u>.  The current state of constitutional law requires prison regulations to be "reasonably related to legitimate penological interests." <u>Thornburg</u>, 490 U.S. at 404 (quoting <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987)).[11]

At issue in <u>Thornburg</u> was a federal Bureau of Prisons (BOP) regulation that allowed the prison warden to reject outside publications mailed to a prisoner if the publication was deemed to be detrimental to the "security, good order, or discipline of the institution or if it might facilitate criminal activity." <u>Id.</u>  The regulations forbid the rejection of a publication "solely because its content is religious, philosophical, political, social or sexual, or because its content is unpopular or repugnant."  <u>Id.</u> at 405.  Publications could not be black-listed categorically under the regulation, but rather, each issue had to be reviewed separately.  <u>Id.</u>  Staff of the warden could screen and approve publications, but only the warden could reject a publication.  <u>Id.</u> at 406.  If the warden rejected a publication, he was required to immediately notify the

---

[11] The portion of the <u>Turner</u> decision—not applicable here—dealing with prison regulation of inmate marriages was legislatively impacted by the passage of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc, et seq.  After passage of RLUIPA, constitutional claims premised on the First Amendment free exercise of religion clause continue to be governed by the <u>Turner</u> standard, however claimants can now bring a claim under RLUIPA, which imposes a stricter standard on prison regulations affecting religion.  <u>See</u> <u>Gladson v. Iowa Dept. of Corrections</u>, 551 F.3d 825, 831-32 (8th Cir. 2009).

inmate in writing of the rejection and the reasons therefor, including a reference to the specific part of the publication deemed objectionable.  Id.  The sender could obtain review of such a decision by the regional director of the BOP; the inmate could submit a grievance of the issue through the prison administrative remedy process.  Id.  The inmate could review the rejected publication unless allowing such review would "provide the inmate with information of a nature which is deemed to pose a threat or detriment to the security, good order or discipline of the institution or to encourage or instruct in criminal activity."  Id.

The Thornburgh Court stated that First Amendment concerns were implicated—both for the inmates and the persons sending mail to the inmates—by prison officials' interference with inmates' incoming mail, but that such rights "must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration."  Id. at 407 (quoting Turner, 482 U.S. at 85).  The Court noted that many on the "outside" have an interest in access to those on the "inside" of prisons, but that certain such interactions, though "seemingly innocuous to laymen," may pose "potentially significant implications for the order and security of the prison."  Id.  Noting that the judiciary was "ill equipped" to administer the "difficult and delicate problems of prison management," the Court held that "considerable deference" would be afforded the regulations of prison administrators.  Id. at 407-08.

49

In adopting its standard of reasonable relation to legitimate penological interests, the Court rejected the <u>Martinez</u> standard which required the state to show that the regulation furthered an important or substantial governmental interest in the least restrictive way. <u>Id.</u> at 408-09. The Court held the <u>Martinez</u> standard did not accord "sufficient sensitivity to the need for discretion in meeting legitimate prison needs." <u>Id.</u> at 410. The <u>Turner</u> reasonableness standard requires the court to evaluate several factors:

1. whether the governmental objective underlying the regulations is legitimate and neutral;

2. whether the regulation is rationally related to that governmental objective;

3. whether there are alternative means of exercising the right that remain open to prisoners;

4. what impact the accommodation of the plaintiff's asserted constitutional right will have on others (guards and inmates) inside the prison; and

5. whether there are obvious, easy alternatives whose existence show that the regulation in question is not reasonable, but is an "exaggerated response" to prison concerns.

See <u>Thornburgh</u>, 490 U.S. at 414-19.

Defendants' explanation of why Mr. Cody's mail from Dr. Griess was intercepted is contradictory. On the one hand, defendants claim the reports

50

were received and inadvertently placed in Mr. Cody's prison medical file because prison officials "overlooked" the "cc" to Mr. Cody on the letter and, thus, did not realize the mail was intended for Mr. Cody.  See Docket No. 43 at ¶¶ 53-54, at p. 14.  On the other hand, defendants claim their actions are justified by an unwritten policy that reports of outside medical care providers are never shown to prisoners because they may contain the dates of future appointments outside the prison, advance knowledge of which would pose a security risk.  Id. at ¶¶ 58-59, at pp. 15-16.  There is also some suggestion that prison policy is to deny prisoners access to reports of outside medical providers altogether.  Id. at ¶¶ 51-52, at pp. 13-14.  So the court is left to guess whether defendants' taking of Mr. Cody's mail was intentional or not.  Neither defendants nor Mr. Cody address the Turner factors that inform the analysis of reasonableness.

Defendants seem to gloss over this issue because, eventually, Mr. Cody received the mail from Dr. Griess on June 9, 2014, some two and one-half months after it was sent.  Thus, they wish the court to adopt a no-harm-no-foul approach and absolve their actions.  In support of this position defendants cite Rowe v. Shake, 196 F.3d 778 (7th Cir. 1999).  In Rowe, the plaintiff brought a First Amendment claim pursuant to § 1983 for prison officials' delay of his mail.  Id. at 780-81.  Rowe submitted evidence showing the time which had elapsed for delivery of 34 items of mail over a two and one-half month period.  Id. at 780.  Sixteen items were delivered within a week or less, 10 items

were delivered within two weeks, 8 items took more than two weeks, including the longest delay for one item which was 26 days.  Id.  The Seventh Circuit held that Rowe's claim should have been dismissed on screening without serving defendants because it failed to state a claim.  Id. at 782.  The delays in receiving mail were "short-term and sporadic" and Rowe never alleged that his mail was legal mail or that the delays resulted from a content-based prison regulation or practice.  Id.

Rowe does not carry the day for defendants in this case.  Instead of short-term, sporadic delays unrelated to content, Mr. Cody has alleged a delay of two and one-half months.  Defendants have asserted that the delay was due to application of a content-based regulation or practice, and the delays were systematic—three separate times Dr. Griess mailed his report to Mr. Cody and three times defendants intercepted it and placed it in Mr. Cody's medical file without notice to either Dr. Griess or Mr. Cody.  These facts are distinguishable from the facts of Rowe.

Defendants also cite Burkett v. Glen, 2011 WL 4715162 (W.D. Ark. 9-14-2011), and Valiant-Bey v. Morris, 829 F.2d 1441, 1444 n.5 (8th Cir. 1987), in support of their argument that mere delay is insufficient to state a First Amendment claim for interference with one's mail.  However, Burkett dealt with prison policies whereby mail was not distributed to prisoners on the weekends.  Such short-term delays were not of constitutional magnitude.  Burkett, 2011 WL 4715162 *2.  Although Valiant-Bey reiterated this holding in a footnote, the

52

court held that plaintiff's allegation that defendants delayed delivery of mail from the Moorish Science Temple in a manner that discriminated on the basis of race and religion was sufficient to state a claim. Valiant-Bey, 829 F.2d at 1444. A two- or three-day delay which is not content-based is distinguishable from the present case involving a two and one-half month delay based on content.

Mr. Cody relies on Martinez and Knight v. Lombardi, 952 F.2d 177, 179 (8th Cir. 1991), for the assertion that he has proven his claim by showing that defendants gave notice to neither himself nor to Dr. Griess when they "seized" his mail. As discussed above, Martinez is no longer good law, having been supplanted by the reasonableness inquiry under Turner. The Knight court did state that the failure to give notice promptly at the time mail is seized is "arguably a procedural due process violation," but the court rejected Knight's claim and said it should have been dismissed without ever being served on defendants because Knight could show no injury flowing from the alleged violation. Knight, 952 F.2d at 179.

Knight does not help Mr. Cody here. First of all, the plaintiff in Knight asserted a procedural due process claim under the Fifth and Fourteenth Amendments. Id. Here, Mr. Cody asserts a First Amendment claim, which is subject to different analysis. See Docket No. 1 at p. 20. Secondly, the reason the court rejected Knight's claim was because his ability to submit grievances to protest the seizure of his mail was not compromised in that case. Knight,

952 F.2d at 179.  The same is true here for Mr. Cody:  the record shows Mr. Cody timely learned of defendants' "seizure" of his mail, if that is what it was, and filed numerous grievances about the seizure itself and the underlying policy.

Mr. Cody also asserts that the "obvious and easy alternative" to a blanket prohibition on inmates receiving medical mail from outside providers would be to simply examine the mail to see if any reference was made to a future medical appointment.  If not, the mail can be delivered to the inmate without any security risk.  If so, defendants can simply redact the date and provide a redacted copy of the medical report to the inmate.  He cites Stevens v. Ralston, 674 F.2d 759, 761 (8th Cir. 1982).  But the Stevens court's holding was expressly based on Martinez which, as previously explained, is no longer the appropriate standard.  Stevens, 674 F.2d at 760.  However, Mr. Cody's suggestion makes sense to the court and dovetails nicely with the fifth Turner factor.

The current state of the record is highly unsatisfactory for purposes of determining whether summary judgment should issue to one party or the other on Mr. Cody's interference with mail claim.  On the one hand, the Turner standard is quite lenient for defendants and should be easy to meet.  But defendants themselves have muddied the waters by introducing contradictory explanations in the record for why they withheld Dr. Griess's report from Mr. Cody.  This error is further compounded by defendants' failure to address

54

the five <u>Turner</u> factors that inform the court's analysis as to whether their regulation was reasonably related to a legitimate penological objective.  Finally, although defendants also try to characterize the withholding of Dr. Griess' report as an inadvertent mistake that was ultimately rectified, Mr. Cody introduced into the record a sworn statement that, even after June 9, 2014, on several occasions defendants continued to withhold medical records that were mailed to him and addressed to him directly.  <u>See</u> Docket No. 23 at p. 19 (verified brief of Mr. Cody in response to defendants' earlier motion to dismiss).  Defendants admit that only two of these five reports were given to Mr. Cody.  <u>See</u> Docket No. 42-34 at ¶¶ 15-17.

On this record, the court recommends denying both parties' cross-motions for summary judgment on Mr. Cody's interference with mail claim.  Neither party has presented a clear case establishing undisputed material facts and an entitlement to judgment as a matter of law.

## CONCLUSION

Based on the foregoing facts, law, and analysis, this magistrate judge respectfully recommends that defendants' motion for summary judgment [Docket No. 41] be resolved as follows:

1.     defendants' motion should be granted as to Mr. Cody's claims one and two, his denial of access to the courts claims, because Mr. Cody has failed to show an "actual injury."

2.     defendants' motion should be denied as to Mr. Cody's claim three, his interference with mail claim.

The court recommends that Mr. Cody's motion for summary judgment [Docket No. 26] be denied in its entirety.

**NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED November 12, 2015.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge